Good morning. My name is Michael Flomenheft. If I can put aside for a moment the Rule 17 and jurisdictional infirmities under Berrios and the conversion after the fact of the directed verdict dismissal, which we claim was prejudicial, I'd like to just touch on three points briefly that I think would be very helpful to the panel. The first is that it was plain error for the district court, without legitimate substantiation, and under the guise of credibility, to inject its own personal opinions to denounce every single medical and scientific witness ostensibly as hired guns, and to label uncontradicted expert testimony and objective studies as biased and speculative. If it's a bench trial, and this is in fact the motion that was originally made, then the court can make credibility findings, just as a jury could. So it seems to me that the thing that you have jumped over is the key to the whole thing. That is, was it correct, was it error, to decide this as if it was a motion in which credibility is taken against the movement, in other words, in your favor, and instead decided under a motion in which credibility can be taken into account? Because if credibility can be taken into account, you know, she has an awfully long way in being able to decide credibility. So that's the question, and my question there goes to whether when you said you had no witnesses and didn't need any witnesses, you were really saying, or we should read you to be saying, that it was a motion in which credibility could be taken into account, then you would have witnesses, because in fact, at the moment, none of you were focusing on it. I mean, you all assumed that motion was the correct one. So I just don't quite know what it was we should say about whether you would have waived or not. Your language about waiver, then, was very strong. Well, let me respond to that issue. I mean, you can see on page 873, the first statement that Mr. Raven made to the Court before he made the motion was, I spoke to Mr. Flomanhoft about this. We discussed the motion before we walked into the courtroom. The motion we discussed was a directed verdict motion, and we discussed the fact that a directed verdict motion involving failure to prove a final prima facie case. It doesn't appear on the record. It appears on the record, the first sentence on page 873, that I discussed this with Mr. Flomanhoft. It's right on the record. I've spoken with Mr. Flomanhoft. All of his proof is in terms of injury. And then it goes on that you say, I don't oppose the motion being made at this time. I agree with counsel that whatever proof I'm going to elicit, whatever proof I'm going to elicit to support proximate cause and threshold, I know that's the Court's concern, causation, I have already elicited. Yes, for purposes of a directed verdict motion. For purposes of a directive verdict motion where all the presumptions regarding credibility are in my favor. On its face, you agreed to have no more witnesses in the face of a motion which would decide credibility in your favor. That's right. I think that, on the face of it, is there. What you actually said to the Court was, we have no witnesses, we're perfectly fine. And the question is, how do we read that? Well, I think you read it, I mean, everybody, everybody was focusing on the, everyone was mistaken. I mean, there was no mistake here. Everyone was talking about a directed verdict motion. I'd like to ask you about a slightly different aspect of this point, which is, it seems to me that you have a strong position with respect to the question that you've been discussing so far. When the motion that's on the table is labeled as a directed verdict motion, you're saying, I have no further witnesses, doesn't necessarily mean that you have no further witnesses that might bear on credibility as opposed to a directed verdict motion. But my question is, why didn't you raise this with the District Court after the confusion became clear? I don't see why, it seems, if I understand correctly, you are for the first time making this argument in our Court. It seems to me you should have said to the District Court what you were now saying to us. You should have said, look, when I said I had no further witnesses, that was with respect to a directed verdict motion. I didn't have more witnesses and there was no need to have because I had sufficient evidence. But now that you're dealing with credibility, I have more witnesses. Why should you be able to raise that for the first time? Why didn't you tell the District Court? Because if you told the District Court, I mean, it was an obvious error for the District Court to convert a directed verdict motion into a motion that would involve credibility findings. And you could have said to the District Court, we have more witnesses on credibility matters that you must take into account. And the District Court could have cured the error at that time. Well, let me say three things in response to that, Your Honor. Number one, with respect to the credibility issues that the Court relied upon, number one, the issue of taxes and skiing and the emails, those issues were part of the examinations of Krinsky and Quintero, which we hadn't even finished. We were in the middle of. And the Court was also aware that on Tuesday, Judge, can I just finish with one point? The Court was also aware that on Tuesday, I had scheduled a biomechanical engineer to testify, to rebut the accident reconstruction and biomechanical testimony. There was no need for that testimony because all I was dealing with was a prima facie case, whether I put sufficient proof. My point is, why didn't you make the argument that you're making to us here? Why didn't you say those things to the District Court? You say, you know, when I said I had no further witnesses, that was about a directed verdict motion. We certainly have more witnesses for the issue to be submitted for ultimate findings on credibility. The Court was on notice we had further witnesses because we were in the middle of further witnesses. You're still not answering the question. Let me just finish. No, no. You listen to me for a moment. You're still not answering Judge LaValle's question. When the District Court said, made credibility findings, you had an opportunity to say, Your Honor, you're making credibility findings under this motion on credibility issues. We had more witnesses, and you should listen to them before you make this kind of finding, our waiver of witnesses referred to a directed verdict. That you could have done. And nothing you have said since Judge LaValle has asked the question answers why you didn't do that. Let me respond to that. You may have had good reason, but I'd like to hear it. Okay. My reason was that I viewed the decision as a directed verdict decision, and I viewed the statement regarding credibility as just the Court's editorializing about her opinion regarding the witnesses. The Court had been disparaging of every single witness during the trial, and I viewed that just as the Court's surplusage. She said it was a directed verdict motion. She said in the transcript, all we're deciding is the issues of collision. Okay. Let me see if I understand you. You are saying that you read what the Court was doing was being a directed verdict motion, which then the Court was making comments that she could not make, and not that she had actually converted it to a 15B, to a different motion. Of course not. If you look at the, and when I got the minutes sometime later, the minutes said. Well, can you say that? The Court has, there's a footnote in the Court's opinion in which the Court expressly acknowledges that she has converted the motion. She expressly acknowledges it in a footnote. She converted the motion a month, at least a month after the motion was assigned. Yes, when she did it, when it was clear what she had done, why didn't you go and say, Judge, you can't do that. We had, we indeed had no further witnesses on the directed verdict motion, but we definitely have more witnesses on credibility matters, and you had no right to do that without offering us the opportunity to put on more proof, so please hear our witnesses. I mean, what was the point of that? What were the options for the Court at that, what were the options for me and the Court at that juncture? I mean, the Court had already broadcast its position about the case. What was she going to do? Nullify it? You're just asking us to send it back to her. No. Oh, you mean you want us to send it to a different judge? Yes, of course. You're not going to get that, so forget about that. I mean, I mean, the Court has already. We don't do that unless a court has behaved in misconduct or demonstrated bias. Well, I think the Court has. Go get another judge. I mean, if I can continue my other points, I mean, the Court is, the Court, the Court has in every which way disparaged every single witness. You're saying to us, you're saying to us essentially, I recognize that the Court had done something illegal by converting our motion from a directed verdict motion to one that would bear on credibility, and that the Court had erred by not allowing us to put on the witnesses that we have on that matter. But I'm not going to raise it with this judge because this judge has shown she doesn't like our case. If I raise it, the judge is going to hear my witnesses and rule against us, so I will hold off and raise it in the Court of Appeals in the hope of getting a different judge on remand. That's, is that what your thinking was? That, that's what the strategy was? That wasn't, that wasn't my thinking. My thinking, that was close to my thinking. My thinking was that I had, I had a judge. But in a different, in what way was it not that? It seems to me that's what you have just told us. No, what, what. You wouldn't want this judge to hear our additional witnesses because I already knew how she would rule. Isn't that what you just told us? Close, Judge. What I was, what I was, I, I thought that had the, the judge having, having, having dismissed my case after, after making the conversion, that my recourse was the, my recourse was the second step. You could be saying you were sure she would rule against you in letting you have more witnesses and say, uh, listen, when you were saying no, you were saying you had no one and you're just bringing them up. But the problem with that, which would have been, you know, uh, seemed a more plausible argument, is that at that point, if the judge had said no, then you would have had an appropriate appeal. I mean, then you would have said the judge was wrong. It should have allowed me to bring in the other witnesses, but you didn't give the chance, the judge to make the chance, uh, make the decision, which would properly give us something to reverse her on. There was another consideration and they're on page, if you see on page 770, in the middle of, um, the accountant, Quintero's testimony, really towards the beginning, the judge said, listen, you're two and basically said you're two and a half days are up, you have 10 more minutes to finish your case. There wasn't going to be no more time for further witnesses. She was cutting, she was cutting me off. She was cutting me off by my legs, given all those are the kinds of things that if you had given her a chance to make that decision, then you could properly appeal because we can perfectly well say, uh, 10 days to five days as well within her discretion, but it is not within her discretion to cut out credibility witnesses when she is now deciding credibility where she had said no, and you know, that's an easy thing for us to say, but you didn't give her that chance. Yeah, I apologize. So I saw her differently. I thought, I mean, she told me, she told me on 770, I had 10 minutes left to finish my direct case regardless. And in terms of, in terms of, in terms of credit, I mean, regardless of what you think of the propriety of the conversion, I think the credibility determinations still have to be substantiated in the 52C. I'm talking about something you would have told the judge after you saw the judge's written opinion with a footnote that expressly acknowledges that the judge had converted the motion from a directed verdict to a, to a, to a, to another motion relating to credibility, which the judge had no entitlement to do. That was the point at which you had to say to the judge, you've made an error. You've not allowed me to put on my witnesses. I want my witnesses to be heard. And here they are. Yeah. I didn't, I didn't see it that way because she had already ruled that I, that I had no more time to put on my witnesses, except for about a witness, which would have been germane to a 52C motion. Were there in fact, um, I mean, you, you said that you were prepared apart from the credibility issues that you had adduced all the evidence that you had with respect to causation, correct?  The prima facie case had to include causation, right? Yes. But the biomechanical engineer that was scheduled was going to address causation issues that were raised by the defense experts. Why wasn't that part of your prima facie case? Why didn't he testify as part of your prima facie case? What you said to the judge was that you had adduced all the evidence that you had with respect to, um, causation. Because he was, because he was responding to the, he was responding to the defense arguments, say, well, it wasn't necessary for my prima facie case. And we could skip it. Was it necessary to show causation as part of your prima facie case? No, no, no. I had shown, I had shown causation repeatedly. Almost, I mean, almost every single expert had shown causation, but, but. I don't understand that. I didn't see any evidence of causation at all. Well, first of all, Dr. Lippin, if you look at 10, if you look at 1035, probably the most important exhibit in the whole appendix. Your argument is that if your witnesses were believed and the witnesses of the other side were disbelieved, then there was enough evidence there to show causation. That's your argument that causation is not shown only because, uh, the credibility of your witnesses was not there, that there was enough evidence of causation, uh, on credit. If you, is that your argument? Yes, I actually have one minute left. I just want to make one point that bears on that. I think you're seven minutes over. Oh no, no, no. Eight, eight minutes. I asked for eight and two. And I've given you seven minutes over. Um, the red light's been on for seven minutes, but go ahead, go ahead, finish up, and then you'll have two minutes rebuttal, just this one, one point. And then on pages eight 53 and four, the defense biomechanical engineer, engineer Thibault, who was credited by the court for the proposition that the crash could not have caused brain injury conceded two things. He conceded that his analysis only applied to the deep structures of the scleosome, which had nothing to do with the injuries claimed in this case. And it also, also conceded that his analysis only applied to injuries that occurred at the moment of the accident, which Dr. Lipton explained on one 52 was this not, not like not this type of a brain injury. This type of brain injury occurred over ensued over weeks and weeks and months. I mean, he acknowledged specifically that he, that his analysis did not apply to, to the frontal lobe injury and to the temporal and to the temporal lobe injury and to the external injury that this plaintiff had. So when the defense, when the, when the judge relied upon Dr. Thibault, uh, to anchor her, anchor opinion and favor, uh, uh, Dr. Dr. Dr. Thibault, she was, she was relying upon evidence that had been stripped of all relevance. She was really relying upon nothing. Thank you. Thank you. Minutes of rebuttal. Mr. Isaac. Good morning, your honors. Brian Isaac. Um, I represent obviously the appellee. I don't know, maybe I'm reading this the wrong way, but I have a little bit of a different take on this and I think the language here is key and you're focusing in on it. Would it be okay if I just referred to certain specific language? Because I think it deals directly with what your concerns are. If you look at page eight 73 of the record, I'm sorry, eight 73 of the record line 16, this is Mr. Raven, the defense lawyer. And he says, would the judge dot, dot, would your honor entertain a motion for a directed verdict and a motion to dismiss at this point? And the basis of that would be on proximate cause. There's been absolutely no proof that this injury was a result of an accident that occurred on February 26, 2005. There's absolutely no proof in the record whatsoever at this point. I just want to emphasize for you the term directed verdict and a motion to dismiss. I'll parrot back to it afterward. Then Mr. Flamenhoff is a very, very good lawyer. Very smart. You saw how he tried a case. This is what he says. I'm giving him his actual language. I just want to say this judge, although I oppose the motion, I do not oppose the motion made at this time. I agree with counsel that whatever proof I'm going to elicit, whatever proof I'm going to elicit to support proximate cause and threshold, I know that's the court's concern causation. I've already elicited. So when he says motion, it can be a motion directed verdict he's speaking to rather than the motion to dismiss. And if one believes that the witnesses, if believed, if believed, sufficed to make a case of proximate cause, that's the question the presider was asking. But if one believes that they sufficed to do that, then you can, I think one can read that as being misled as to what credibility findings the court would be permitted to make. Now that still leaves the question of why after when the court converts this to a different motion, they didn't. But you know, I brought those things. I rarely do because I've been pouring over them one way or the other. And though I think they can be read your way. I don't think it's necessary. And if you go on to the end of the paragraph that you were reading on page 874 council says, so again, I would oppose a directed verdict, but I would welcome resolution of that issue sooner rather than later. What 100, you have absolutely no disagreement from me, but now I want to go to the second part, which is where I wanted to turn you to afterward, because this is going to be important. And judge Calabresi, it deals directly with what you said. Start on eight 77, uh, line 18. And we're going to go to eight 78, uh, line 13. This is the judge. I'm going to cut off where she is because you don't need the prefatory language on, on 18 judge. I understand based on what everybody has told me that the plaintiff has introduced all of the evidence that he intends to introduce on this question. Is that correct? Mr. That's true. Your honor, the court. All right. And that the remainder of the witnesses would be related to future earnings and things like that. Mr. That's true. Your honor, the court, and that includes Mr. Quintero. Correct. Mr. Of course, Mr. Quintero is a forensic accountant, the court. This is her exact words. All right. So based on my evaluation of the credibility, credibility of the I have determined that the plaintiff has failed to sustain his burden of establishing that whatever happened in this crash was the proximate cause of the alleged injuries. I am therefore directing a verdict for the defendant. I, and I will issue a written decision to follow that at that point, what the court is doing is saying, since the witnesses that he would bring in, do not have anything to do with credibility. And I am making credibility findings. I will direct a verdict. The problem is that she is not permitted to make credibility findings on a directed verdict. And so that statement at that moment is erroneous and reversibly erroneous. Weber, then the plaintiff failed to raise that in appropriate time is what we've been. But I, I, I don't, you know, I understand where you're going. Let me give you a hypothetical. Maybe it'll better, better serve my purposes. And let's just take the easiest thing in the world. Let's say you make a motion for a directed verdict at the close of the case, and you don't have a first year lawyer. We're talking in a bench trial. I'm talking, no, let's talk, let's talk about, let's talk about a jury trial. Cause it'll just be easier to elucidate my point and jury trial now and parties, the lawyers make their arguments and the judge says at that time, listen, I'm going to grant the motion because I assess the credibility of this witness. I didn't assess the credibility of that witness. I like this witness. I didn't like that witness. Any experienced lawyer, any good lawyer is going to stand up and scream and say right then, not even at the time, judge, you can't do it. Now you're just saying that what we have been saying, he could have done later and should have done later when the court in a note specifically said what it did, he might have done before, even if they hadn't, but we don't really need to reach that because we do have the later one. Let me ask you a completely different question. And that is the judge excluded the neurophysiologist and excluded him in her language, it seemed because neurophysiologist should not talk about causation. Now I must say, I think that if that is the ground for excluding, that is incorrect because neurophysiologists can certainly speak to causation. The problem again is that when the neurophysiologist was originally presented, he wasn't presented as a causation witness. The language specifically was he's here to show something else. And I've got it here again. And so my question is, should we read what the court did as this was excluded because initially this wasn't presented as a witness on causation and therefore it would take the other side. Oh, well, that's not what the court said. No, that's my, I'd like you both to address that question because if the neurophysiologist was excluded only for the wrong reason and could have spoken, and I think nearly could have spoken to causation and effecting to it, that might be a matter of some significance. I think the way I read the record, and I agree with you, it's not a hundred percent clear was in accordance with what you said originally, that the witness was presented for a different reason. And I read it and I may be wrong that the question was overall too broad. I have a better answer for you though, on all of that. When you look at the judge's decision, whether she considered that particular piece of evidence or not would have been immaterial to her ultimate decision. I don't know how you can say that because we don't know what the physiologist, had the physiologist been allowed to testify on causation. We don't know what this person who was a distinguished neurophysiologist would have told us on causation. Now it does say when she was presented, she's a neurophysiologist and will report on the results of her neuropsychological testing of the plaintiff. That is how she was originally presented. And the question is, is that sufficiently a presentation that allows them to come in and say it should be for causation as well or not? We would say no, but if I may, just in response to something that you said, Judge Calabresi, when you look at the judge's decision, and I know you've studied it very, very intently, the judge makes no pretense about the qualifications of Mr. Flamenhoff's witnesses. She says in her decision, they are exceptionally credentialed. They have very, very, very good educational characteristics and they're really terrific doctors. She didn't believe the doctors, not because the doctors necessarily weren't believable. But we don't know about this one. But, but, but she talks about them all in the context of the plaintiff. But you cannot say, because I don't believe Dr. A, B, C, and D on these things, when they're perfectly good things, that means I will not believe any doctor that the plaintiffs bring in. That's, you know, that just doesn't make any sense. She specifically did. She brings in, because I don't believe the people they brought, she brings in the Archbishop of Canterbury and I say, oh, well, I don't care if he was the primate of all England. I don't believe him because he's a witness of these people. That just doesn't. My time is up. I asked for permission. Is it okay if I respond to the judge? Okay. I, I'm just, I like to ask. She disregarded the testimony of all of their expert witnesses. Every one of them. It's in the decision. She says that what happened was this was a minor accident. He goes to a chiropractor immediately afterward. And then within two days, this is before there's any diagnosis of any brain injury with an MRI that is completely normal. He says on 762 of the record. We're, I think we're aware of that. Yes, but, but, but it goes the right, this is at 762 line one. It's only six, yes. Six, seven D line one question. And two days after you, after being referred to Mr. Flammenhoff in your mind decided that you were not going to be able to work anymore and that you were going to put this matter in the hands of your lawyer. Correct answer. Yeah. Question. And did you tell Vivian bell, the wife that you were going to do that answer? Yes. So I get the argument. All I'm saying is it didn't matter in the context of what this judge found in the context of this evidence as her, as her in her role as a trier of fact, in addition to being the judge, I see my time is up. If you don't have any more questions, I'm happy to sit down. I guess you have another question. I'm sorry. You know, no, go ahead. Um, uh, nobody has said anything about the issue of the plaintiff's competence and the, um, the judge's refusal to hear the, um, the, the application relating to the substitution of plaintiff for the person's appointed as the guardian. Um, what about that? I don't think it's, it's, it's, it's actually relevant to the issues about which we're talking. Well, it's the issue that I'm talking about. No, no, no, no. I'm not, I'm not, I didn't mean it that way. I meant that it's not relevant with regard to what the judge did. And if you take a look, I know it's an issue. I mean, it seems to me potentially to raise the issue about whether the trial was properly conducted. Agreed. Well, let me finish. I'm not, I'm not denigrating the question at all. It's a legitimate question. Additionally, and additionally, if, if properly the plaintiff should not have been the plaintiff, but the guardians for the plaintiff, there is no reason to believe that, uh, such a plaintiff would have said, would have agreed with counsel to say, we have no more witnesses. I mean, you know, counsel can't just make that decision on his own. He has to talk to his client. And if a client is the wrong one, then we can question that. Now, my problem with that is I'm not sure when a motion was made. Well, maybe as a, as a predicate to answering Judge LaValle's and Calabresi's questions, you could just look at the order and explain to me, which I had, I had difficulty reading it because much seemed to have been scratched out in the version we have in the record, whether the appointment of the guardian of his, his, as his wife, uh, for a limited purpose, as I see it was for anything more than the purpose of, um, substitution in the suit or whether it was for general purposes. I thought it was, I thought it was for more for a substitution in the suit. And what I was going to say to Judge LaValle is when you look at the start of the case, I would think that that would be the time where this issue would be broached when the judge says we have the trial, if there was a problem with respect to the fact that, uh, the wife wasn't a named plaintiff in the case, that was the time to bring it up. I would also point out to the court that Mr. LaValle had a very, very, very detailed testimony relative to the case, relative to how he was feeling, tremendous cross-examination. Well, I just think it's not a, it's not a situation where... A court that has, that had jurisdiction of this matter declared him incompetent and make a very explicit ruling that a guardian was appointed for expressly referring to this case. But why doesn't that mean that the guardian is the appropriate plaintiff in the case? It may well be. And the article 81, the article 81 is not a necessarily a complete incompetence. It's to, it's to provide for certain, uh, certain leeway and certain things. It's not that he was completely incompetent. I'm not agreeing that it wouldn't have been a better situation to honor the article 81 order. All I'm saying is that... Let me, let me expand a little bit, because as I thought about this issue, at first I thought it was a fairly serious issue. And then later I thought a little less so because the plaintiff's counsel was certainly aware that his client, that, that, that Krinsky had been declared incompetent and that, um, it's the wife, is it? That was appointed guardian. And so he knew who was the plaintiff for this case. So, um, uh, my, my recent thinking has been along the lines that yes, there was an error of failure to, to acknowledge the request to substitute the name plaintiff, but that can simply be accomplished by substituting the name of the plaintiff. There's no reason to think that the attorney wasn't taking instructions from the person he knew was the appropriate plaintiff, because he knew that the court had found his client, his earlier client had found Krinsky to be not competent to be the client. Yes, that's true. And that's what I was trying to say, probably not as elegantly as you did. When you look at the beginning of the trial, there's no statement there, judge, we can't proceed because we have an article 81 order, and this isn't a proper or appropriate plaintiff. So I just don't see how it would have had an effect one way or another on the ultimate determination in the case. And if, and certainly at least under, you know, New York law, not much of a federal law, but on the subsidy of New York law, that can be accomplished in the pro-tunc. So that could be subject to a waiver analysis as well. I'd like to come back a moment to your argument that it didn't matter whether some witness that should have, and I'm not saying they should have been admitted to testify, wouldn't matter because the court had already decided that none of his witnesses were believable. The problem with that argument is that that is the mirror image of what he was saying. He didn't bother to, uh, uh, to, to, uh, raise the question of credibility. It's saying it's all been decided. So that if what you're saying is true, something which we were really pressing him and saying, you have no right to do that, uh, may have more legs. And so I'm a little surprised by your making that argument. Well, but you're, Judge Calabrese, um, I don't think I'm conceding anything that you think I'm conceding. I'm saying that based on the judge's decision, we know how she felt after the fact that you can't divorce my argument from its temporal relevance because they're at completely different times. And actually the lead case, I think in New York on harmless error is the second circuit's decision in the United States against Kahana. I think it is. Well, I don't believe, frankly, I do not believe that a lead case and New York law can be a second circuit decision. Well, that's patent error. Whenever we do a decision by the Supreme court, the lowest court in New York, that's fair enough, but this is on, this is just on harmless error. And the quote that is used all the time. It's in all the books is absolute perfection in trials will never be accomplished as long as human beings are conducting them. So again, that's the, I don't think that given what we know, the judge's credibility findings were well after the motion was made that that error, assuming it be error would have had any adverse income and therefore would be considered harmless. I don't understand the argument that you made earlier in response to judge Calabresi's question, because, um, um, it, it seems to me it's mixing apples and oranges, or maybe I've got the wrong metaphor and maybe I should not talk metaphor at all. But, um, uh, you say that because the, the judge assessed the plaintiff pursuant to the plaintiff's conduct where the plaintiff immediately said, Oh, I'm in gravy now, I don't have to work anymore. I'm turning this over to my lawyer. This is, this is great. Um, I don't see how that precludes the possibility that a doctor can nonetheless find that the plaintiff's illness or whatever it is, his deficiencies are attributable to the accident. The plaintiff may be, may be the worst scum in the world and devious and lying and, and everything else. And nonetheless, it may be that his injury is, is, is, is defects are attributable to the accident. And a doctor can testify. You'll get no disagreement with me. I, I, I didn't, I wasn't going even, I wasn't limiting myself to that. No, no. You were saying that, that the, that the judge's, um, uh, failure, judge's refusal to hear a witness, uh, was excusable because the judge had decided that the plaintiff is a scheming liar about the only, only in part when you read, and I know you've read the judge's decision because you've cited it verbatim. What the judge said was that right after the accident, there was this plan on the part of the plaintiff to take this injury, which was originally a minor injury and convert it into a major injury, she assessed the credibility of the defendant Chase after the accident saying it was a minor accident. He didn't seem to have any problem. He drove his car away and she looked at the, the testimony of our two experts, the biomechanical and the Delta force person said that that made sense. And then looked at what happened with respect to each of the medical witnesses put on by the plaintiff. And, and for reasons that she set forth, including, uh, comparing a rear end collision with trauma, uh, suffered by an Iraqi war veteran, having a chiropractor who can't give an affirmation, talk about brain damage, the fact that there are assumptions about brain volume and other things that they just weren't credible, she didn't take one thing. Doesn't you see the problem with that is that doesn't deal with the witness that wasn't heard. If the witness that wasn't heard came in and gave credible testimony, then the fact that the plaintiff may be a terrible crook and actually think that the accident had nothing to do with it doesn't matter because a jury, if it were a jury could believe the witness that came and said, despite what this fellow thinks, this was what was going on. That's why we have to focus on whether the exclusion on causation, which is the key issue of by the neurophysiologist was appropriate or was not. And that goes back to the question of what that neurophysiologist was presented for, which was the language that I read you. I know I'm way over my time. Can I just respond to that? And then we'll wrap up. Judge Calabresi. Mr. Flamenhoff is right in one respect. We disagree about a lot of things, but we will agree about this. He did have witnesses who did testify. Um, he had a lot of them, as you know, it's six or seven who did testify as to causation. They said that this was caused by the accident. So it's not like this was the key witness, the only witness who was testifying as to that. And she rejected, did not believe any of the correct. So it's not like it's the only evidence we get to the answer to judge Calabresi his question. I'm sorry. When are you going to answer judge Calabresi his question? Well, my argument is that it's, I don't think they were presented properly. And I would think that any error would be definitionally harmless error. Given the rejection, it was cumulative to what all of the other witnesses testified to basically in, in, how do we know it was cumulative if it wasn't heard? Because if you have four, if you have four or five doctors who have given testimony on causation and the court says, listen, I don't believe them because I don't think that this is the type of accident that could have caused this particular injury, given my acceptance of the testimony of the defendant. Don't know what this very distinguished neurophysiologist might have said. They might have said, for instance, I have done research of a new sort that no one has, and here are 27 cases in which it is undisputable that this kind of thing has caused that. Now, you know, I'm not saying he would have, she would have, but it is possible that she would have and given testimony, which was in no way repetitious of the causation arguments that the others made and were rejected. We cannot say that she wouldn't have done it. I suppose that would depend on whether the witness had been presented as someone who would testify to something that was different, not cumulative to the others, because the district court can perfectly well say, I've heard enough experts. You don't get to call them without limit, but you would have to, you would have to present an argument that this witness has something different to testify to. I would just say again, and I say I'm really over is that the generic claims were all the same and the rejection of those claims. Problem is that when this witness was presented, it was presented in totally generic terms without any specific reference to causation. So we always go back to the question of, was this witness properly presented? And that is your strongest argument, which is why I don't understand you, why you've spent so much time on other arguments. Okay. Thank you very much, Mr. Isaac.  Flomenhaf, you have two minutes for rebuttal. Thank you very much. Um, first of all, with respect to the neuropsychologist, Dr. Wasserstein, I just want to add that on page 569, after Dr. Court said, um, this was a total waste of my time. Uh, the, the judge, the judge ruled, uh, looked at this as cumulative because she didn't understand that this was the only neuropsychologist testifying the other causation testimony, which was given on one 82 by Dr. Uh, by Dr. Lipton with absolute cert, absolute certainty that the brain damage occurred from this accident based on the exhibit on 1035, probably the most important exhibit in the whole case. The testimony by Dr causation testimony by Dr. was from a neuroscientific standpoint on four 84, 44, where he gave course examination, he gave causation on course examination were from different, different disciplines. No, this was the only neuropsychological discipline neuropsychologist that was testifying on causation from a neuropsychological discipline. Um, that's pardon? Did you explain that to the judge? You know, um, I don't recall my exact remarks. I was, I was, I was kind of flabbergasted when she, when she said this is a total waste of my time. No, I was, you said that she could testify on causation. If a judge said, uh, uh, I'm not going to hear her on causation because she's a neuropsychologist, so it's a waste of time. I mean, that was what that exchange was. So the question was, what was she presented foot to testify for before? It was actually, it was my, my assumption. I think I even put in, I may have put in the damages memo to the put in before or in the, in her reports that she was test. I mean, her reports, the qualifier, um, indicated that she was testifying about causation. I mean, there was no, I mean, the defense neuropsychologist was talking about, was going to talk about causation. Our neuropsychologists are going to talk about causation from a, from a, a neuropsychological perspective. That's not, that's not a cumulative. That's a distinct perspective, different from the neuroradiology of Dr. Lipton on 182 and the neuroscientific causation of 484 by Dr. Buxbaum with respect, with respect to the guardianship issue. It was my, it's my understanding of the burial. First of all, I did make repeated requests. Could you pause for a second and explain to me the guardianship order? Because the version we have is quite marked up and it looks, um, it's difficult to ascertain what the guardianship was with respect to. I, it seems to be a limited guardianship. Was it only with respect to this case or was with respect to other functions that, um, Mr. Krinsky needed his wife to be able to perform? You know, my, my, my understanding was with respect to this, this particular case. So for the purposes of this case, he was deemed incompetent and his wife was appointed his guardian. His wife and Dr. and Robert Kruger, an attorney. But for no other purposes. Um, I don't, I don't think so. Thank you. That's what I needed. But I did, but in response to Dr. Judge LaValle's, uh, statement, I did make repeated requests of the court, uh, Judge Kuhn's and repeat requests of, of, of the district court, Judge, Judge Dinelli to, to appoint the proper representatives in this case. It was my understanding under Berrios that. How did that, how did that in the end hurt you? If you knew that, uh, with respect to this case, uh, Mr. Krinsky was not competent and that's not an unreasonable thing. He may be so concerned with this case and he may indeed with respect to this case, be a crook, which may be why, uh, a crook for pathological reasons, which may be why a district, a state court would say he can't properly bring this case because he's gotten himself all in a tangle. So someone else, but you knew that. So how did that hurt you when you could confer with his wife with respect to any of the issues which were relevant? Well, I think it's speculative how it could hurt me, but my, my, my understanding of the Berrios, it's not a question of how I can, I can hurt me under Berrios. If the court, if the court, there's not a proper representative substituted, the court is not allowed to make a determination on the merits. Wasn't it your only request that the complaint, didn't you request that the, that the complaint be amended to reflect the guardians as the plaintiff? I wrote it. I wrote to Judge Kuhn's. You have to, you had to write a letter to, for, uh, to, to make this type of motion. I wrote a letter to the court, to Judge Donnelly on January, on, on January 14th, uh, during, uh, before the trial during the trial, I, I, um, I'll give you the citation. Did you share my question? It was my only request. No, it wasn't my only request. I made multiple requests, requests to try and preserve the jurisdiction. Wasn't it your request that the complaint be amended, that the, that the court amend the complaint to reflect that the guardians are the plaintiff? That's right. That's all you requested? Well, to substitute the proper party. I said, I told the judge the proper parties are not in this case. What you were asking was to have the document modified so that the document, the complaint, would show the guardians as the plaintiff. It was my, yes, it was my understanding. I'm not asking you your understanding. Sure, sure. I'm asking you what you requested. Yes. To protect the court's jurisdiction. Thank you very much. Thank you very much. We will reserve decision.